

# Fourth Court of Appeals

## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-23-00095-CV

**SATURN AVIATION, LLC**,
Appellant

v.

**BMH AIR, LLC** and Evolution Jets, LLC,
Appellees

From the 216th Judicial District Court, Gillespie County, Texas
Trial Court No. 15102
Honorable Stephen B. Ables, Judge Presiding

Opinion by:     Lori Massey Brissette, Justice

Sitting:        Irene Rios, Justice
                Lori Massey Brissette, Justice
                Adrian A. Spears II, Justice

Delivered and Filed: July 2, 2025

AFFIRMED IN PART; REVERSED AND RENDERED IN PART; REMANDED IN PART

This dispute began in August 2017 when the crew of a chartered flight for Bruce Willis, the king of memorable one-liners, could not start the aircraft's auxiliary power unit ("APU"). The APU issue (which was ultimately fixed, allowing the aircraft to take Willis to New York) kicked off a contractual dispute involving multiple provisions of multiple contracts over the airworthiness and leasing of the aircraft, ensnaring the parties in a legal battle that is now eight years old. But, unlike Willis's character John McClane, who refuses to die despite taking on terrorists single-

handedly, today we put this dispute to rest, affirming in part, reversing and rendering in part, and remanding in part to the trial court for entry of judgment in accordance with our decision.

## "JUST THE FAX, MA'AM. JUST THE FAX."[1]

Beginning in June 2016, BMH Air, LLC, and Maximum Flight Advantages, LLC d/b/a Evolution Jets ("MFA") entered into a dry lease agreement (the "Lease") under which BMH transferred operational control over an Embraer EMB-135BJ aircraft to MFA. A dry lease is a contractual agreement whereby the lessor (owner) provides an aircraft to the lessee (operator) without any crew, maintenance, or insurance. Around the same time, MFA entered into a dry sublease agreement (the "Sublease") with Saturn, effective June 2016. As a part of the Sublease, Saturn agreed to provide everything needed to operate the plane as a charter—i.e., maintenance, hangar space, fuel, piloting, management, and chartering services. In return, MFA agreed to reimburse Saturn for operating and other expenses, including hangar space and maintenance work. Several months later, all three of these parties—BMH, MFA and Saturn—executed a Subordination Agreement, backdated to June 2016 to be contemporaneous with the other two agreements. The Subordination Agreement provided BMH a priority interest in the aircraft, required Saturn to subordinate its interest, and obligated MFA to protect BMH's rights.

## "WELCOME TO THE PARTY, PAL."[2]

In February 2017, MFA (which had been doing business as "Evolution Jets") sought to transfer its interests to a new entity, Evolution Jets, LLC. MFA and BMH executed an assignment of the Lease (the "Lease Assignment") that assigned MFA's "rights" and "duties and

---

[1] DIE HARD 2 (Gordon Company & Silver Pictures 1990) (Bruce Willis's character LAPD Lieutenant Detective John McClane to hotel desk clerk trying to pick him up while he waits for fax to come through).

[2] DIE HARD (20th Century Fox Gordon Company 1988) (McClane after shoving terrorist out of high-rise window to get attention of police who, to that point, were not helping).

responsibilities" under the *Lease* to Evolution. And, MFA, in an agreement signed by MFA, Evolution, and Saturn, assigned its rights and duties under the *Sublease* to Evolution (the "Sublease Assignment"). MFA, however, remained responsible under the assignments of the original contracts in the event Evolution did not perform.

Several months later, Evolution and Saturn negotiated and executed an Amended Sublease. The Amended Sublease maintained the lease of the aircraft to Saturn, and Saturn promised to continue providing the same services. It also contained new terms regarding compensation for use of the aircraft. It provided an effective date of June 6, 2016, the date of the original agreements.

### "ZED'S DEAD, BABY. ZED'S DEAD."[3]

Now, here's where Bruce Willis comes into play. Just as he was told in *Die Hard*, he was the wrong guy, in the wrong place, at the wrong time, the issue with the aircraft's APU arose prior to the departure of his flight from Ohio to New York.[4] After the aircraft completed the chartered flight at issue, a dispute arose among the parties concerning the airworthiness of the aircraft and, thereafter, Saturn's invoicing relating to the aircraft pursuant to the Amended Sublease. The parties dispute the rest of the story (and sadly Bruce Willis does not play a major role in it), but eventually Evolution sent Saturn a notice of termination, grounding the aircraft and terminating the relationship.

Three weeks later, BMH and Evolution sued Saturn, asserting breach of contract and tort claims, seeking declaratory and equitable relief, damages, and attorney's fees. BMH also applied for a writ of sequestration, seeking possession of the aircraft from Saturn. In response, Saturn asserted counterclaims against BMH and Evolution for breach of contract, quantum meruit, unjust

---

[3] PULP FICTION (A Band Apart & Jersey Films 1994) (quoting Willis's character, Butch Coolidge, telling his girlfriend that owner of motorcycle they were about to ride was dead).

[4] He responds in *Die Hard*, "The story of my life." DIE HARD.

enrichment, among others, along with several affirmative defenses. The trial court granted BMH a writ of sequestration for the aircraft and ordered BMH to place $375,000 into the registry of the court as a sequestration bond.

### "MAYBE YOU NEED A DRINK TO EASE THE PAIN OF BEING WRONG."[5]

After a bench trial over several days between August and December of 2022, the trial court entered findings of fact and conclusions of law and rendered judgment in favor of BMH and Evolution on their breach of contract claims against Saturn. The trial court awarded BMH $498,109.28 in damages plus interest and awarded Evolution $78,595.66 in damages plus interest. The trial court also awarded BMH attorney's fees and expenses totaling $456,863.83 and allowed it to withdraw its sequestration bond. The trial court rendered a take nothing judgment on Saturn's counterclaims.

### "COME OUT TO THE COAST. WE'LL GET TOGETHER, HAVE A FEW LAUGHS."[6]

Saturn appealed this case to our court in early 2023, and BMH filed a notice of cross-appeal. On August 30, 2024, we withdrew our submission date and abated and remanded to the trial court to amend its Findings of Fact and Conclusions of Law.[7] The supplemental clerk's record, specifically the amended findings, was filed on October 21, 2024. We lifted the abatement on March 12, 2025, reinstated the case, and the parties orally argued the case before this court on April 17, 2025.

---

[5] STRIKING DISTANCE (Columbia Pictures 1993) (quoting Bruce Willis's character Sergeant Thomas Hardy).

[6] DIE HARD (McClane referring to his wife's invitation to get together, which was impetus for him being in situation he found himself, crawling through air duct, bloodied and tired).

[7] We required clarification as to when the trial court was referring to the Sublease or the Amended Sublease in its findings and conclusions.

## "YIPPIE-KAI-YAY"[8]: SATURN'S APPEAL

Saturn contends neither BMH nor Evolution were entitled to damages or attorney's fees for Saturn's alleged breach of the agreements. It also argues it was entitled to damages. Finally, it contends BMH was not entitled to recover the cost of "replacement aircraft" damages pursuant to the Sublease or Amended Sublease.

### A. Can BMH Recover Damages and Attorney's Fees for Saturn's Breach?

Saturn argues the evidence is legally insufficient to support the trial court's findings in favor of BMH as to the claims related to the Subordination Agreement because the Subordination Agreement (1) fails for lack of consideration, (2) terminated by its own terms prior to any alleged breach by Saturn, and (3) is not effective. Saturn also contends that, even if the Subordination Agreement was effective, it was not a proper basis for the damages awarded to BMH.

### 1. Was There Sufficient Consideration?

### a. Standard of Review and Applicable Law

The trial court found the Subordination Agreement was supported by adequate consideration. But Saturn contends (1) it received no consideration in return for signing the Subordination Agreement, (2) no presumption of consideration arises under the Subordination Agreement, and (3) no probative evidence supports the trial court's finding the Subordination Agreement was supported by adequate consideration.

If, as here, "a case proceeds to a bench trial and the trial court enters findings of fact and conclusions of law, appellate courts defer to the trial court's findings of fact—so long as they are supported by the record—and reviews conclusions of law de novo." *Sw. Elec. Power Co. v. Lynch*,

---

[8] DIE HARD (McClane to terrorist Hans Gruber on walkie-talkie). "Yippie-Kai-Yay" is a peculiar expression of "joy, bravery[,] and relief" as one finally takes a step into the fire, ready to rumble. *See* Calum Russell, "*'Yippee Ki-Yay': The origins of the iconic "Die Hard" phrase*," FAR OUT, https://faroutmagazine.co.uk/yippee-ki-yay-origins-of-die-hard-iconic-phrase/.

595 S.W.3d 678, 683 (Tex. 2020); *see also BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002) (citation omitted) ("The appellant may not challenge a trial court's conclusions of law for factual insufficiency; however, the reviewing court may review the trial court's legal conclusions drawn from the facts to determine their correctness.").

If "a party attacks the legal sufficiency of an adverse finding on an issue on which [it had] the burden of proof, [it] must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue." *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001); *see, e.g.*, *Nigerian Found. v. Umezulike*, No. 01-20-00262-CV, 2022 WL 2923202, at *5 (Tex. App.—Houston [1st Dist.] July 26, 2022, no pet.) (mem. op.). In reviewing for legal sufficiency, "the reviewing court must first examine the record for evidence that supports the finding, while ignoring all evidence to the contrary." *Dow Chem.*, 46 S.W.3d at 241; *see, e.g.*, *Nigerian Found.*, 2022 WL 2923202, at *5. This court "indulge[s] every reasonable inference in support of the challenged finding." *Nigerian Found.*, 2022 WL 2923202, at *5 (citing *Gunn v. McCoy*, 554 S.W.3d 645, 658 (Tex. 2018)). If no evidence supports the finding, we "will then examine the entire record to determine if the contrary proposition is established as a matter of law." *Dow Chem.*, 46 S.W.3d at 241; *see, e.g.*, *Nigerian Found.*, 2022 WL 2923202, at *5. "The point of error should be sustained only if the contrary proposition is conclusively established." *Dow Chem.*, 46 S.W.3d at 241; *see, e.g.*, *Nigerian Found.*, 2022 WL 2923202, at *5.

"To be enforceable, a contract must be based on consideration, also known as mutuality of obligation." *TLC Hosp., LLC v. Pillar Income Asset Mgmt., Inc.*, 570 S.W.3d 749, 760 (Tex. App.—Tyler 2018, pet. denied); *see, e.g.*, *Ayala v. Soto*, No. 04-12-00860-CV, 2014 WL 1614281, at *4 (Tex. App.—San Antonio Apr. 23, 2014, pet. denied) (mem. op.). "Consideration is a present exchange bargained for in return for a promise." *H.L. Zumwalt Constr., Inc. v. Rd. Repair, LLC*,

No. 04-20-00134-CV, 2021 WL 4754835, at *5 (Tex. App.—San Antonio Oct. 13, 2021, pet. denied) (mem. op.).

In construing contracts, courts "strive to . . . promote mutuality and to avoid a construction that makes promises illusory." *TLC*, 570 S.W.3d at 760; *see, e.g.*, *Vice v. E. Texas Mun. Util. Dist.*, No. 12-21-00225-CV, 2023 WL 3033146, at *3–5 (Tex. App.—Tyler Apr. 20, 2023, pet. denied) (mem. op.). A contract's existence "presumes consideration for its execution." *Ayala*, 2014 WL 1614281, at *4; *see, e.g.*, *Michael v. NE CS First Nat'l, LP*, No. 02-23-00307-CV, 2024 WL 1579009, at *8 (Tex. App.—Fort Worth Apr. 11, 2024, no pet.) (mem. op.) ("The recital of consideration creates a presumption that the contract was supported by consideration, and Williams bore the burden to show that the contract lacked consideration."); *see also King v. Baylor Univ.*, 46 F.4th 344, 357 (5th Cir. 2022) ("Lack of consideration is a weak reed."). A "party alleging lack of consideration has the burden of proof to rebut th[e] presumption of consideration." *TLC*, 570 S.W.3d at 761.

Consideration "may consist of some right, interest, or profit, or benefit that accrues to one party or of some forbearance, loss, or responsibility that is undertaken or incurred by the other party." *Michael*, 2024 WL 1579009, at *8 (quoting *Katy Int'l, Inc. v. Jinchun Jiang*, 451 S.W.3d 74, 85 (Tex. App.—Houston [14th Dist.] 2014, pet. denied)) (internal quotation marks omitted). "A promisor 'benefits' when the promisor acquires a legal right to which the promisor would not otherwise be entitled in exchange for a promise." *Ayala*, 2014 WL 1614281, at *4 (quoting *N. Natural Gas Co. v. Conoco, Inc.*, 986 S.W.2d 603, 607 (Tex. 1998)). "A promisee suffers a legal 'detriment' when, in return for a promise, the promisee surrenders a legal right that the [promisor] otherwise would not have been entitled to exercise." *Ayala*, 2014 WL 1614281, at *4 (quoting *N. Natural Gas Co.*, 986 S.W.2d at 607). "The detriments must induce the parties to make the

promises, and the promises must induce the parties to incur the detriments." *TLC*, 570 S.W.3d at 761. And a "promise made in recognition of a benefit previously received by the promisor from the promisee is binding to the extent necessary to prevent injustice." *See Benson v. Forgie*, No. 14-22-00519-CV, 2023 WL 5623568, at *5 (Tex. App.—Houston [14th Dist.] Aug. 31, 2023, no pet.) (mem. op.). A "lack of consideration occurs when the contract, at its inception, does not impose obligations on both parties," meaning the agreement "lacks mutuality of obligation and is unenforceable." *TLC*, 570 S.W.3d at 761.

### b. Discussion

The Subordination Agreement was introduced as an exhibit at trial. *See Dow Chem.*, 46 S.W.3d at 241; *see, e.g.*, *Nigerian Found.*, 2022 WL 2923202, at *5. It provides: "Now, Therefore, in consideration of the mutual promises herein contained and other good and valid consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows . . . ." This, by itself, creates a presumption of consideration. *See Ayala*, 2014 WL 1614281, at *4.

Saturn also elicited testimony from Brian Heath, one of the owners of BMH, as follows:

> Q. And in your mind is this subordination agreement strictly for BMH's benefit?
>
> A. I . . . believe the subordination agreement gave clarity to the relationship between three parties. So, you know, using an analogy it was like a two trailer tractor-trailer and the intention of the subordination agreement was to link all components of the relationship.
>
> Q. What do you think Saturn was getting out of the subordination agreement that it didn't already have through the sublease with Evolution?
>
> . . . .
>
> A. I think they were getting clarity. So I think one of the benefits of a contract is to actually know what the expectations are of all parties. So I think what Saturn did get is the benefit of clarity of their responsibilities related to the relationship of all three parties.

On Heath's redirect, the following exchange took place:

> Q. [A]t the time that BMH had requested all parties to execute a single subordination agreement, if Saturn through its counsel had said, No, we're not going to do that, what would you have done?
>
> A. We would have gone through the process of removing the plane from the certificate that Saturn had founded and provided.
>
> Q. Was Saturn's willingness to execute a negotiated subordination agreement a prerequisite to allow them to continue exercising possession and operational control of your airplane?
>
> A. Yes.
>
> Q. And in fact, as you recall was the subordination agreement the result of negotiation between counsel for all three parties to the agreement?
>
> A. Yes.

Heath later testified on re-cross:

> Q. [O]ne of the things you said . . . was that you would have terminated the sublease had Saturn not executed the subordination agreement. Do you recall that?
>
> A. Correct.

And then on redirect, he explained:

> Q. Was your decision not to ask Mr. [Jamie] Thomas [of Evolution] to invoke that clause to terminate the sublease based on Saturn's agreement to execute the subordination agreement that they negotiated with you?
>
> A. Yes.
>
> Q. If we look at the subordination agreement itself, on page 1 do you see the part that starts "now therefore"?
>
> A. Yes.
>
> Q. What—can you read that for us?
>
> A. [As read] Now therefore in consideration of the mutual promises herein contained and other good and valid consideration the receipt and sufficiency of which are hereby acknowledged the party hereto agrees as follows.
>
> Q. And that is part of the document that was negotiated with Saturn and its counsel and signed by Saturn and signed by Evolution and BMH. Correct?
>
> A. Correct.

Despite its burden to counter the presumption, Saturn did not question any of its own witnesses about whether it had received consideration for the Subordination Agreement.

Accordingly, there is evidence supporting the trial court's finding, specifically that Saturn received "clarity" as well as BMH's forbearance in not forcing MFA to terminate the Sublease with Saturn. *See H.L. Zumwalt*, 2021 WL 4754835, at *5; *Michael*, 2024 WL 1579009, at *8; *see also Forbearance*, BLACK'S LAW DICTIONARY (12th ed. 2024) *available at* Westlaw ("1. The act of tolerating or abstaining. 2. The act of refraining from enforcing a right, obligation, or debt.").

Based on the foregoing, and mindful we cannot substitute our judgment for the trier of fact, we cannot conclude Saturn demonstrated, as a matter of law*,* all vital facts rebutting the presumption of consideration, much less the lack of adequate consideration. *See Dow Chem.*, 46 S.W.3d at 241; *see, e.g.*, *Nigerian Found.*, 2022 WL 2923202, at *5; *TLC*, 570 S.W.3d at 761. As a result, we cannot conclude the evidence offered to prove consideration is legally insufficient. *See Graham Cent. Station, Inc. v. Pena*, 442 S.W.3d 261, 263 (Tex. 2014); *see also City of Keller*, 168 S.W.3d at 810; *TLC*, 570 S.W.3d at 760 (providing in construing contracts, "[c]ourts strive to . . . promote mutuality and to avoid a construction that makes promises illusory"). We, therefore, overrule Saturn's point of error. *See Dow Chem.*, 46 S.W.3d at 241; *Nigerian Found.*, 2022 WL 2923202, at *5.

### 2. Did the Subordination Agreement Terminate Prior to Any Breach by Saturn?

Saturn next contends the Subordination Agreement automatically terminated on February 7, 2017 when the parties entered into the Lease Assignment, the Sublease Assignment, and, a few months later, the Amended Sublease. It points to section 15 of the Subordination Agreement that states it "shall automatically terminate upon the termination or expiration of the Sublease." And it reasons that the legal effect of the assignments and amendment is to terminate the original

documents—more specifically the Sublease. But the trial court rendered the following conclusion of law: "10. . . . [T]he Subordination Agreement was in full force and effect until September 16, 2017 and was not terminated as a result of the execution of the Amended Sublease with Evolution Jets LLC, the BMH-MFA Amendment & Assignment or the MFA-Saturn Amendment & Assignment."

### a.   Standard of Review and Applicable Law

We review the trial court's conclusion de novo and will uphold a trial court's legal conclusions "if the judgment can be sustained on any legal theory supported by the evidence." *Nigerian Found. v. Umezulike*, No. 01-20-00262-CV, 2022 WL 2923202, at \*5 (Tex. App.—Houston [1st Dist.] July 26, 2022, no pet.) (mem. op.). Moreover, "[i]ncorrect conclusions of law will not require reversal if the controlling findings of fact will support a correct legal theory." *Id.*; *see, e.g.*, *Nguyen v. Yovan*, 317 S.W.3d 261, 269–70 (Tex. App.—Houston [1st Dist.] 2009, pet. denied); *see also* TEX. R. APP. P. 44.1(a) ("No judgment may be reversed on appeal on the ground that the trial court made an error of law unless the court of appeals concludes that the error complained of . . . probably caused the rendition of an improper judgment.").

When we interpret a contract, "we ascertain and give effect to the parties' intent expressed in the text, . . . and not in the abstract but in the context in which the words appear and were written—the realities they were meant to address." *Bd. of Regents of Univ. of Texas Sys. v. IDEXX Lab'ys, Inc.*, 691 S.W.3d 438, 445 (Tex. 2024); *see Point Energy Partners Permian, LLC*, 669 S.W.3d at 804 ("Consistent with the law's 'strong public policy favoring freedom of contract,' contracting parties are generally free to determine the lease's terms, and those terms define their respective rights and duties. Our duty is to 'respect and enforce" those terms by ascertaining the parties' intent as expressed within the lease's four corners." (quoting *Endeavor Energy Res., L.P.*

*v. Discovery Operating, Inc.*, 554 S.W.3d 586, 595 (Tex. 2018)); *see also Scout Energy Mgmt., LLC v. Taylor Properties*, 704 S.W.3d 544, 547 (Tex. 2024) ("Our 'sole objective' in interpreting contractual language is to determine 'the parties' true intentions as expressed in the writing.'" (quoting *BlueStone Nat. Res. II, LLC v. Randle*, 620 S.W.3d 380, 387 (Tex. 2021))). In other words, a "vital part of a text's context is the *purpose* of the text, as gathered from the text itself, consistently with the other aspects of its context." *Point Energy Partners*, 669 S.W.3d at 808 (quoting ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 33 (2012)); *see also U.S. Polyco, Inc. v. Texas Cent. Bus. Lines Corp.*, 681 S.W.3d 383, 390 (Tex. 2023) (per curiam) (agreements must be read in context); *IDEXX Lab'ys*, Inc., 691 S.W.3d at 443–44, 444 (same).

Construing the agreement in the context in which the terms of it are used may "encompass the circumstances present when the contract was entered." *IDEXX*, 691 S.W.3d at 443 (quoting *URI, Inc. v. Kleberg County*, 543 S.W.3d 755, 764 (Tex. 2018)) (internal quotation marks omitted). Put simply, we construe an agreement "from a utilitarian standpoint bearing in mind the particular business activity sought to be served, and avoiding unreasonable constructions when possible and proper." *Point Energy Partners*, 669 S.W.3d at 805 (quoting *Endeavor Energy Res., L.P. v. Energen Res. Corp.*, 615 S.W.3d 144, 148 (Tex. 2020)) (internal quotation marks omitted). "[O]ur quest is to determine, objectively, what an ordinary person using those words under the circumstances in which they are used would understand them to mean." *Id.* (quoting *URI*, 543 S.W.3d at 764) (internal quotation marks omitted). But while "[s]urrounding facts and circumstances can inform the meaning of [contractual] language," they "cannot be used to augment [or] alter" the contractual language. *See URI*, 543 S.W.3d at 758. And we should remain mindful parties "[a]re free to contract for . . . odd results" and "lease drafters are not always driven by

logic." *Burlington Res. Oil & Gas Co. LP v. Texas Crude Energy, LLC*, 573 S.W.3d 198, 211 (Tex. 2019) (quoting *Chesapeake Exploration, L.L.C. v. Hyder*, 483 S.W.3d 870, 874 (Tex. 2016)).

In construing an agreement, "[a]ll the usual 'rules of construction' apply." *Mosaic Baybrook One, L.P. v. Simien*, 674 S.W.3d 234, 257 (Tex. 2023) (quoting *Perthuis v. Baylor Miraca Genetics Labs., LLC*, 645 S.W.3d 228, 236 (Tex. 2022)). We apply a lease's plain, grammatical language unless such an application would clearly defeat the parties' intentions. *Endeavor Energy Res., L.P.*, 615 S.W.3d at 147. We also presume consistent usage and treat specific contract provisions as controlling over general ones. *See, e.g.*, *Mosaic Baybrook*, 674 S.W.3d at 257.

Notwithstanding these rules, the Texas Supreme Court has "been increasingly hesitant" to fall back on default rules "preferring instead to resolve questions of contractual meaning based on objective textual indicators of the parties' intent, if at all possible." *Endeavor Energy Res., L.P.*, 615 S.W.3d at 149; *see, e.g.*, *Piranha Partners v. Neuhoff*, 596 S.W.3d 740, 746–47 (Tex. 2020) (stating same). To that end, "[w]e consider the entire agreement and, to the extent possible, resolve any conflicts by harmonizing the agreement's provisions." *Occidental Permian, Ltd. v. Citation 2002 Inv. LLC*, 689 S.W.3d 899, 904–05 (Tex. 2024) (alteration in original) (quoting *Piranha Partners*, 596 S.W.3d at 744) (internal quotation marks omitted). We avoid reading contract language in isolation and avoid "taking literalism too literally and adopting a wooden construction foreclosed by [the legal text's] context." *Point Energy Partners*, 669 S.W.3d at 808 (footnote omitted) (quoting *Ojo v. Farmers Grp., Inc.*, 356 S.W.3d 421, 451 (Tex. 2011) (Willett, J., concurring)) (internal quotation marks omitted). This approach requires courts to give effect to all contractual provisions, render none meaningless, and reconcile conflicting provisions. *See Point Energy Partners*, 669 S.W.3d at 808; *U.S. Polyco, Inc.*, 681 S.W.3d at 390.

**b. Analysis**

Because section 15 of the Subordination Agreement states that the agreement "shall automatically terminate upon the termination or expiration of the Sublease," the question before us is whether the Sublease was effectively terminated by the Lease/Sublease Assignments and the Amended Sublease or whether it had expired. The Sublease does not refer to expiration. Instead, it provides in section 3.1 that it shall, every year, "renew automatically for additional one (1) year periods on the same terms and conditions." Section 3.1 also addresses termination, providing either party "may terminate this Agreement, at any time and for any reason or for no reason [upon] . . . ninety (90) days prior written notice; provided, further, that this Agreement shall automatically and immediately terminate at any time that Lessor [at the time MFA] no longer has exclusive rights to the Aircraft."[9]

Saturn contends that, upon the Lease/Sublease Assignments, MFA gave away its rights to the aircraft by assigning them to Evolution. Therefore, once MFA no longer had exclusive rights to the aircraft, the Sublease terminated, as did the Subordination Agreement. But, the intent of that language, in section 3.1 of the Sublease, is to ensure that the sublease to Saturn terminates if the lessor no longer has the right to sublease the aircraft, whether that lessor is MFA or, by assignment, Evolution. This makes sense given the very purpose of the agreement is to "lease from Lessor . . . the Aircraft, without crew, on an exclusive basis, and otherwise upon and subject to the terms and conditions of this Agreement." Further, in section 4.1 of the Sublease, Saturn "acknowledges and Lessor warrants that Lessor has exclusive rights to the Aircraft." In the same section, MFA "warrants to Lessee [Saturn] that it has not entered into any agreements with third parties, including lenders that in any way restrict the grant to Lessee of full and complete

---

[9] The agreement also refers to other bases for termination, none of which are relevant here.

Operational Control of the Aircraft." In other words, the intent of the parties was to ensure that Saturn would receive from the lessor, whether that is MFA or its successor, exclusive possession and the right to operational control of the aircraft—and to warrant that the lessor had the right to lease the aircraft to Saturn. As long as those two things were true, the purpose of the agreement continues.

Any other reading would be contrary to the provision of the Sublease that allows for the assignment of the lessor's rights and duties. Specifically, the Sublease states, in section 10.9 "[n]either Party may assign its rights under this Agreement without the prior written permission of the other." Thus, either party could assign their rights with the written permission of the other. If the parties contemplated that MFA could assign its rights under the Sublease, it is inapposite that, by doing so, the Sublease would be automatically terminated. By taking that position, Saturn takes "literalism too literally" and is "adopting a wooden construction" of the Sublease's terms that ignores the full context of the agreement. *Point Energy Partners*, 669 S.W.3d at 808 (quoting *Ojo*, 356 S.W.3d at 451 (Willett, J., concurring)) (internal quotation marks omitted).

Further, it makes much more sense that the Subordination Agreement would only terminate if Saturn lost the right to operationally control the aircraft. The Subordination Agreement characterizes the Sublease as transferring to Saturn "exclusive possession and right to operational control of the Aircraft." This intent is mentioned again in section 5.0 which provides, "Sublessee [Saturn] shall have exclusive operational control of the aircraft at all times for all operations under the sublease for so long as the sublease remains in effect.".[10] Given these provisions, it makes sense that the Subordination Agreement would automatically terminate if Saturn were to ever lose its

---

[10] This does not conflict but comports with the overall purpose of the Subordination Agreement which requires Saturn to (1) remit payments under the Sublease directly to BMH, (2) include BMH as a loss payee on insurance policies required under the Sublease, (3) cause the Subordination Agreement to be recorded with the Federal Aviation Administration, and (4) subordinate its interest in the aircraft to that of BMH.

right to exclusive possession and operational control over the aircraft, as then Saturn would be unable to comply with the Subordination Agreement. But as long as BMH and MFA/Evolution were capable of turning over to Saturn exclusive possession and right to operational control of the aircraft, the terms of the Subordination Agreement would continue to be in effect—requiring payment, insurance, and subordination of interests.

The Sublease also addressed amendments. Specifically, section 10.7 states, "[n]o term or provision of this Agreement may be amended, changed, waived, discharged or terminated orally, but only by an instrument in writing signed by Lessor and Lessee." Thus, again, the parties allowed for amendments, as long as they were in writing and with prior written permission of the other, to the terms of the agreement and permitted them to convey in full or to transfer rights or obligations therein. *See Occidental Permian, Ltd.*, 689 S.W.3d at 904–05; *Point Energy Partners*, 669 S.W.3d at 808. Harmonizing the intent of these provisions along with the automatic and immediate termination provision, we must conclude the parties intended the Sublease to continue in effect and not terminate despite an amendment or assignment, as long as the lessor had the authority to grant full and complete operational control of the aircraft, and the lessee was able to maintain such control of the aircraft under the Sublease.[11]

Further, proof that the parties intended that the original agreements would remain in effect, at least as to MFA, despite the assignments and amendments is the fact that MFA remained obligated under the original agreements despite the assignments and amendments. In the Lease Assignment between BMH, MFA, and Evolution, it states in section 2.2:

---

[11] The Sublease Assignment also amends the effective date of the Sublease from June 6, 2016 to June 15, 2016 because MFA's "possession of the Aircraft was delayed and Assignor did not acquire the Aircraft until June 15, 2016" and because "Assignor and Sub-Lessee intended and agreed that the Lease should be entered concurrently with Assignor's acquisition of the Aircraft." This demonstrates the parties' intent to ensure the Sublease's effectiveness was consistent with Saturn's operational control of the aircraft.

> Lessee [MFA] assigns and Assignee [Evolution] assumes all of Lessee's rights, as well as its duties and responsibilities under the Subordination Agreement. However, Lessee acknowledges and agrees that it shall remain primarily responsible for the discharge of all duties and obligations under the Subordination Agreement, in the event of Assignee fails to perform or otherwise discharge such duties and obligations. Lessor [BMH] hereby consents to this assignment.

Likewise, under the Sublease Assignment between MFA, Evolution, and Saturn, it states in the recitals that "Assignor [MFA] and Sub-Lessee [Saturn] have agreed that Assignor's rights, duties and responsibilities under the Dry Lease may be carried out by Assignee [Evolution], without discharging any such duties and responsibilities of Assignor." Again, the parties demonstrated an intent that the original obligations of MFA under the original Sublease remain intact, despite the assignment.

We therefore construe section 3.1 of the Sublease to be designed to "automatically and immediately" terminate when and if the lessor (whether that was MFA, originally, or Evolution, by assignment) lacked the right to sublet the aircraft to Saturn, but not when the parties, in accordance with the terms of the Sublease, amended or assigned rights under the Sublease pursuant to section 10.7 or 10.9. *See IDEXX Lab'ys, Inc.*, 691 S.W.3d at 445; *Point Energy Partners*, 669 S.W.3d at 805; *Endeavor Energy Res.*, 615 S.W.3d at 149. Accordingly, we cannot hold the trial court erred when it concluded the Subordination Agreement was not terminated in February 2017 by the subsequent assignments and amendments, and we overrule Saturn's point of error. *See Dow Chem.*, 46 S.W.3d at 241; *Nigerian Found.*, 2022 WL 2923202, at *5.[12]

---

[12] Saturn makes the same argument in support of its contention that no liability can be founded on the Sublease—because it effectively ended on February 7, 2017. For the same reasons, we reject this argument and overrule Saturn's point of error in that regard. *See* TEX. R. APP. P. 47.1.

### 3. Can BMH Recover Based on Rights it had Under the Sublease, which was Amended by the Amended Sublease?

Saturn asserts that BMH's claims based on the Subordination Agreement must fail because, even if the Subordination Agreement did not automatically terminate, by its very terms it is limited to BMH's rights under the Sublease which was amended by the Amended Sublease. Thus, it argues the evidence is legally insufficient to support the trial court's findings in favor of BMH as to the claims related to the Subordination Agreement because the Subordination Agreement offers BMH no recourse to sue Saturn for breaches of the Amended Sublease. Moreover, it argues the evidence is legally insufficient to support the trial court's findings because there was no evidence BMH was entitled to assert Evolution's rights in the Amended Sublease.

The trial court found, among other things:

> 35. Evolution agreed to the terms and conditions set forth in the Subordination Agreement when it executed the BMH-MFA[-Evolution] Amendment & Assignment.
>
> . . . .
>
> 41. Saturn agreed that BMH has all of the rights, but none of the obligations, of Evolution under the Sublease.
>
> 42. BMH has the right to assert any contractual remedies for Saturn's breaches of the Sublease.
>
> . . . .
>
> 52. Pursuant to the Sublease, and the Subordination Agreement, which gives BMH all of the rights, but none of the obligations of Evolution under the Sublease, Saturn is liable for all costs, charges and expenses, including reasonable legal fees and disbursements, incurred by [] BMH by reason of the occurrence of Saturn's default and BMH's exercise of its remedies in connection therewith.

Here, BMH would have had the burden to prove Saturn was liable for damages for breaching the Subordination Agreement via its breach of the terms of the Sublease and later the Amended Sublease. If a party attacks the legal sufficiency of an adverse finding on an issue on which it did not have the burden of proof, as Saturn does here, it must demonstrate on appeal that

no evidence supports the adverse finding. *Graham Cent. Station, Inc. v. Pena*, 442 S.W.3d 261, 263 (Tex. 2014). "We will sustain a legal sufficiency challenge if the evidence offered to prove a vital fact is no more than a scintilla." *Id.* (quoting *Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Research Corp.*, 299 S.W.3d 106, 115 (Tex. 2009)) (internal quotation marks omitted). *See generally City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005) (providing court should sustain legal sufficiency challenge if record shows: (1) complete absence of evidence of vital fact, (2) rules of law or evidence bar court from giving weight to only evidence offered to prove vital fact, (3) evidence offered to prove vital fact no more than scintilla, or (4) evidence establishes conclusively opposite of vital fact). When we conduct our review, we credit evidence that supports the verdict if a reasonable factfinder could have done so and disregard contrary evidence unless a reasonable factfinder could not have done so. *See Graham Cent. Station*, 442 S.W.3d at 263. We ultimately measure legal sufficiency by determining "whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *Id.* (quoting *City of Keller*, 168 S.W.3d at 827) (internal quotation marks omitted).

The trial court found BMH was entitled to exercise certain rights under the Sublease flowing from its exercise of Evolution's rights thereunder. The findings make no mention of BMH exercising rights in the Amended Sublease pursuant to the rights granted by the Subordination Agreement (even after we secured amended finding from the trial court), but the court does find BMH's rights are not barred by the Amended Sublease.

Nevertheless, the trial court's findings, with their focus on the rights in the Subordination Agreement flowing from the Sublease, include an implied finding that the Amended Sublease did not eliminate the Sublease and that the references to the provisions in the Subordination Agreement referencing the Sublease still controlled. Because "the trial court does not issue findings of fact

and conclusions of law" to this effect but merely implies them, "we imply all relevant facts necessary to support the judgment that are supported by evidence." *State v. Volkswagen Aktiengesellschaft*, 669 S.W.3d 399, 413 (Tex. 2023) (quoting *Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 150 (Tex. 2013)) (internal quotation marks omitted). However, "[w]hen the appellate record includes the reporter's and clerk's records, these implied findings are not conclusive and may be challenged for legal and factual sufficiency in the appropriate appellate court." *BMC Software*, 83 S.W.3d at 795; *see also Est. of Stavron*, No. 02-20-00404-CV, 2021 WL 5227081, at *4 (Tex. App.—Fort Worth Nov. 10, 2021, no pet.) (mem. op.) ("We apply the same standard when reviewing the sufficiency of the evidence to support implied findings that we use to review the evidentiary sufficiency of jury findings or a trial court's express findings of fact."). "If the parties present conflicting evidence that raises a fact issue, we will resolve the dispute by upholding the trial court's determination." *Volkswagen Aktiengesellschaft*, 669 S.W.3d at 413 (quoting TV Azteca, S.A.B. de C.V. v. Ruiz, 490 S.W.3d 29, 36 n.4 (Tex. 2016)) (internal quotation marks omitted). When the relevant facts in a case are undisputed, an appellate court need not consider any implied findings of fact and considers only the legal question based on those undisputed facts. *See Old Republic Nat'l Title Ins. Co. v. Bell*, 549 S.W.3d 550, 558 (Tex. 2018).

Here, the record includes the clerk's record and the reporter's record, wherein we find evidence of the Amended Sublease which we cannot ignore. As noted above, the parties entered into the Sublease in June 2016. They also entered into the Subordination Agreement, made effective June 2016. In February 2017, they entered into amendments and assignments of the rights and obligations under the Subordination Agreement and the Sublease, replacing MFA with Evolution.

In April and May 2017, Evolution and Saturn negotiated and executed an Amended Sublease. Under the Amended Sublease, Evolution—which now held the right to lease the aircraft—agreed to maintain the lease to Saturn, and Saturn agreed to permit the aircraft to be chartered under its Part 135 certificate.[13] Furthermore, the Amended Sublease contained an integration clause in section 10.1 providing "[t]his Agreement constitutes the entire agreement of the parties as of its Effective Date and supersedes all prior or independent, oral or written agreements, understandings, statements, representations, commitments, promises, and warranties made with respect to the subject matter of this Agreement."[14]

Based on the objective textual indicators of the parties in the Lease/Sublease Assignments and the Amended Sublease, we agree the parties intended for Evolution to succeed MFA with respect to the Sublease and that the Amended Sublease was intended to replace the Sublease as to the agreement between Evolution and Saturn—an intent which had already largely been accomplished by assigning certain rights and obligations to Evolution from MFA. *See, e.g.*, *IDEXX Lab'ys, Inc.*, 691 S.W.3d at 445 (providing when we interpret a contract, "we ascertain and give effect to the parties' intent expressed in the text, . . . and not in the abstract but in the context in which the words appear and were written—the realities they were meant to address"); *U.S. Polyco, Inc.*, 681 S.W.3d at 390 (agreements must be read in context); *Point Energy Partners*, 669 S.W.3d at 808 (providing "vital part of a text's context is the *purpose* of the text, as gathered from the text

---

[13] A part 135 certificate, issued by the Federal Aviation Administration, is an air carrier certificate that allows an operator to provide aircraft charter operations directly to a user and are governed by 14 C.F.R. Part 135. Saturn also agreed to provide maintenance, hangar space, fuel, piloting, and chartering services for the Aircraft, among other things. *Id.* §§ 2.0-6.0. The Amended Sublease also contains certain revised terms regarding compensation for use of the Aircraft that were not in the Sublease. *See id.* § 3.5. The provisions in the Amended Sublease are otherwise substantially identical to the Sublease.

[14] This provision is limited to the agreement between parties to the Amended Sublease—Evolution and Saturn—and does not impact MFA's rights and obligations under the prior Sublease, which remain intact despite the Sublease Assignment and, through MFA, BMH's rights under the same agreement.

itself, consistently with the other aspects of its context" and we construe agreement "from a utilitarian standpoint bearing in mind the particular business activity sought to be served, and avoiding unreasonable constructions when possible and proper."); *see also Occidental Permian, Ltd.*, 689 S.W.3d at 904–05 (providing "[w]e consider the entire agreement and, to the extent possible, resolve any conflicts by harmonizing the agreement's provisions"); *Point Energy Partners*, 669 S.W.3d at 808 (explaining we avoid reading contract language in isolation).

This is also supported by our discussion above of the use of amendment and assignment rights in sections 10.7 and 10.9 of the Sublease and the fact that the rights and obligations therein did not trigger the "automatic and immediate" termination provision of the Sublease or, as a result, the "termination or expiration" provision in the Subordination Agreement. Moreover, the fact that the parties backdated the Amended Sublease to have an effective date of June 6, 2016, i.e., to be contemporaneous with the signing of the Sublease and the effective date of the Subordination Agreement, also supports the conclusion that the parties intended for the rights and obligations within the Sublease to continue, in amended form, through the Amended Sublease. Thus, we construe the agreements to also mean that the provisions of the Subordination Agreement then applied to the Amended Sublease. *See, e.g.*, *IDEXX Lab'ys, Inc.*, 691 S.W.3d at 445; *U.S. Polyco, Inc.*, 681 S.W.3d at 390; *Point Energy Partners*, 669 S.W.3d at 808.

This is contradicted by the trial court's findings, which also include the legal conclusion that the Sublease, not the Amended Sublease, was the source of Saturn's liability. We "may review the trial court's legal conclusions drawn from the facts to determine their correctness." *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002) (citation omitted). Based on the foregoing, this conclusion by the trial court—that the Sublease, not the Amended Sublease was the source of Saturn's liability—is erroneous.

Nevertheless, we may not reverse the judgment unless we conclude the trial court's error probably caused the rendition of an improper judgment. *See* TEX. R. APP. P. 44.1(a)(1); *BMC Software*, 83 S.W.3d at 794 ("If the reviewing court determines a conclusion of law is erroneous, but the trial court rendered the proper judgment, the erroneous conclusion of law does not require reversal."); *see also Kia Motors Corp. v. Ruiz*, 432 S.W.3d 865, 883 (Tex. 2014) (explaining we review entire record, and require complaining party to demonstrate judgment turns on error); *Rosemond v. Al-Lahiq*, 331 S.W.3d 764, 766–67 (Tex. 2011) (providing we must affirm judgment if we can uphold it on any legal theory supported by record); *Mission Ridge P.U.D. Homeowners Ass'n, Inc. v. Hines*, No. 04-18-00214-CV, 2019 WL 691503, at *3 (Tex. App.—San Antonio Feb. 20, 2019, pet. denied) (same). Here, because the portions of the trial court's findings singling out certain provisions of the Sublease as the basis of Saturn's liability are virtually identical in the Amended Sublease, we cannot conclude references to the Sublease instead of the Amended Sublease in the trial court's findings probably caused the rendition of an improper judgment.

With this in mind, we return to Saturn's contention that BMH had no rights in the Amended Sublease. In support of its argument, it singles out section 7.6 of the Subordination Agreement, which provides: "Lessor [BMH] shall have all of the rights, but none of the obligations, of Lessee [MFA] under the Sublease, however, nothing herein shall be construed to allow Lessor [BMH] to assume or take assignment of the Sublease without also assuming the obligations of Lessee [MFA] under the Sublease." This language plainly provides BMH may assert the lessor's rights under the Sublease. Given that the Sublease Assignment assigned MFA's rights as lessor to Evolution, and then Evolution amended the Sublease, BMH's rights were carried with it.

Following on our review and harmonization of the provisions above, such an amendment and assignment would be authorized by section 10.9 of the Sublease, which authorizes the parties

- 23 -

to the Sublease to convey in full or to transfer rights or obligations therein with prior written permission from the other. *See Occidental Permian, Ltd.*, 689 S.W.3d at 904–05; *Point Energy Partners*, 669 S.W.3d at 808. Such an amendment would also be consistent with the provision of the Sublease Assignment providing "[a]ll remaining terms of the [Sublease] remain in full force and effect." This analysis also applies to the parties' decision to later have Evolution and Saturn enter into the Amended Sublease with substantially the same terms and conditions, backdating it to be contemporaneous with the Subordination Agreement. BMH was therefore entitled to exercise any rights it had pursuant to the Subordination Agreement both as to the Sublease and later the Amended Sublease because Evolution was subject to the terms of the Sublease pursuant to the Sublease Assignment and later as a party to the Amended Sublease. Accordingly, although the trial court's findings and conclusions are erroneous, we cannot conclude they caused the rendition of an improper judgment, meaning we overrule Saturn's point of error. *See* TEX. R. APP. P. 44.1(a)(1); *BMC Software*, 83 S.W.3d at 794; *Mission Ridge P.U.D. Homeowners Ass'n, Inc.*, 2019 WL 691503, at *3.

### 4. Can Saturn Be Liable for BMH's Damages?

Saturn also argues the evidence is legally insufficient to support the trial court's findings of fact and conclusions of law that Saturn, not Evolution, is liable for BMH's damages awarded pursuant to the Subordination Agreement. Saturn points to Section 7.1 of the Subordination Agreement which provides: "Lessee shall be liable for any costs, charges or expenses incurred by Lessor in enforcing or protecting its rights under this Agreement." According to Saturn, this would make MFA or Evolution, not Saturn, responsible for BMH's damages.

### a. The Findings of Fact and Conclusions of Law, and the Final Judgment Award

The trial court found, among other things:

35. Evolution agreed to the terms and conditions set forth in the Subordination Agreement when it executed the BMH-MFA[-Evolution] Amendment & Assignment.

36. Saturn failed to comply with the terms and conditions set forth in the Subordination Agreement.

39. Saturn failed to cooperate with BMH's exercise of BMH's rights, powers and remedies under the Subordination Agreement to:

   a. immediately exercise any and all of BMH's rights and remedies under the Lease free and clear of any and all interest Evolution or Saturn may claim in the Aircraft;

   b. enforce, cancel or terminate the Sublease;

   c. repossess the Aircraft; and

   d. exercise any other remedy available to Lessor pursuant to applicable law, including but not limited to the return of the Aircraft to BMH upon BMH's demand.

41. Saturn agreed that BMH has all of the rights, but none of the obligations, of Evolution under the Sublease.

42. BMH has the right to assert any contractual remedies for Saturn's breaches of the Sublease.

. . . .

51. The following sums of money, if paid now in cash, would fairly and reasonably compensate BMH for damages it sustained and/or incurred resulting from Saturn's failure to comply with the Sublease and Subordination Agreement:

   a. BMH incurred $262,937.40 in reasonable and necessary costs to inspect and repair Aircraft and return it to airworthy condition caused by Saturn's failure to comply.

   b. BMH incurred $37,771.88 in reasonable and necessary incidental and consequential costs assisting BMH in retaking possession of the Aircraft, having the Aircraft inspected and repaired, and returning the Aircraft to service caused by Saturn's failure to comply with the Subordination Agreement and Sublease.

52. Pursuant to the Sublease, and the Subordination Agreement, which gave BMH all of the rights, but none of the obligations of Evolution under the Sublease, Saturn is liable for all costs, charges and expenses, including reasonable legal fees and disbursements, incurred by [] BMH by reason of the occurrence of Saturn's default and BMH's exercise of its remedies in connection therewith.

Here, BMH had the burden to prove Saturn was liable for damages, identified by the trial court as "costs" for breaching the Subordination Agreement and Sublease/Amended Sublease.[15] *See Graham Cent. Station*, 442 S.W.3d at 263. As set forth above, we must therefore determine whether to sustain this legal sufficiency challenge to the trial court's findings by determining whether no evidence supports the adverse finding. Based on the trial court's findings, it concluded Saturn is "liable for all costs, charges and expenses, including reasonable legal fees and disbursements, incurred by [] BMH by reason of the occurrence of Saturn's default and BMH's exercise of its remedies in connection therewith." We may review the trial court's legal conclusions drawn from its findings of fact to determine their correctness. *See City of Keller*, 168 S.W.3d at 810; *BMC Software*, 83 S.W.3d at 794.

### b. Analysis

We must therefore determine whether, based on the trial court's cited provisions of the Subordination Agreement and the Sublease/Amended Sublease, Saturn was appropriately held liable for damages of (1) "$262,937.40 in reasonable and necessary costs to inspect and repair Aircraft and return it to airworthy condition caused by Saturn's failure to comply" and (2) "$37,771.88 in reasonable and necessary incidental and consequential costs assisting BMH in retaking possession of the Aircraft, having the Aircraft inspected and repaired, and returning the Aircraft to service caused by Saturn's failure to comply with the Subordination Agreement and Sublease."

Section 7.1 of the Subordination Agreement provides that MFA/Evolution is liable for all "costs, charges or expenses" incurred by BMH in enforcing or protecting its rights under the

---

[15] *See* Discussion *supra* regarding Sublease and Amended Sublease in Section A.3. (concluding references in findings to Sublease rather than Amended Sublease did not cause rendition of improper judgment and concluding evidence showed parties intended references to Sublease in Subordination Agreement to apply to any amendment of sublease—or Amended Sublease)

Subordination Agreement including in connection with a sublessee event of default. [16] Section 7.1 of the Subordination Agreement provides in full:

> Sublessee and Lessee each further agrees that: in the event of a breach by Lessee or Sublessee under this Agreement, default by Lessee under the Lease, or default by Sublessee under the Sublease (any of such defaults being referred to herein as a "Default"), Lessor may: (i) immediately exercise any and all of its rights and remedies under the Lease free and clear of any and all interest Lessee or Sublessee may claim in the Aircraft; (ii) enforce, cancel or terminate the Sublease; and discharge any [] International Interests created by the Sublease; (iii) repossess the Aircraft; and (iv) exercise any other remedy available to Lessor pursuant to applicable law. All rights granted hereunder shall be cumulative and not alternative, shall be in addition to and shall in no manner impair or affect Lessor's rights under the Lease, or any other agreement, statute or rule of Law. Lessee and Sublessee each agrees to cooperate with Lessor's exercise of any such rights, powers and remedies, including but not limited to the return of the Aircraft to Lessor upon Lessor's demand. Lessee shall be liable for any costs, charges or expenses incurred by Lessor in enforcing or protecting its rights under this Agreement.

But section 9.2(b) of the Sublease and Amended Sublease provides that "Lessee [Saturn] is liable for all costs, charges, and expenses, including reasonable legal fees and disbursements, incurred by the Lessor by reason of the occurrence of any Lessee Event of Default or the exercise of Lessor's remedies with respect thereto." These provisions, at first glance, seem to conflict. Notably, though, section 7.6 of the Subordination Agreement provides, "Lessor [BMH] shall have all of the rights, but none of the obligations, of Lessee [MFA/Evolution Jets] under the Sublease." Taken together, it is clear the parties intended to allow BMH the choice of asserting its right to recover from MFA/Evolution under the Subordination Agreement (which would then mean MFA/Evolution could recover from Saturn under the Sublease/Amended Sublease) or to step into

---

[16] "Costs," "charges," and "expenses" are not defined, but we give those words their plain, ordinary meaning. "Costs" are "[a]n expense incurred to achieve some end; the amount charged or price paid for something; an expenditure made for the purpose of procuring something." *Costs*, BLACK'S LAW DICTIONARY (12th ed. 2024) *available at* Westlaw. "Charges" are "to fix or ask as fee or payment." *Charges*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/charge. "Expenses" are a "financial burden or outlay." *Expenses*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/costs.

the shoes of MFA/Evolution to recover directly from Saturn under the Sublease/Amended Sublease.

This is consistent with the first three sentences of Section 7.1 of the Subordination Agreement. The first sentence provides BMH "may," in the event of a breach by lessee [MFA/Evolution], or sublessee [Saturn], of the Subordination Agreement or Sublease (or Amended Sublease): (1) *enforce*, cancel, or terminate the Sublease (or the Amended Sublease); (2) repossess the Aircraft; or (3) exercise any other remedy available to BMH pursuant to applicable law. Such rights are cumulative and not alternative to any other rights of BMH under the Lease, or any other agreement, statute, or law. Moreover, MFA/Evolution and Saturn are required to cooperate with BMH's exercise of such rights. In other words, BMH could pursue any remedy available to it under applicable law against Evolution *or* Saturn under either agreement. Thus, it is clear they intended to allow BMH the option of enforcing the Sublease/Amended Sublease against Saturn directly.

Returning to the question, may Saturn be liable to BMH for (1) "$262,937.40 in reasonable and necessary costs to inspect and repair Aircraft and return it to airworthy condition caused by Saturn's failure to comply" and (2) "$37,771.88 in reasonable and necessary incidental and consequential costs assisting BMH in retaking possession of the Aircraft, having the Aircraft inspected and repaired, and returning the Aircraft to service caused by Saturn's failure to comply with the Subordination Agreement and Sublease"? Our answer is yes. The trial court's findings identify Saturn's liability as for "costs." While the fourth sentence of section 7.1 of the Subordination Agreement places such liability squarely on MFA/Evolution, section 7.6 of the same agreement allows BMH to step into the shoes of MFA/Evolution to recover directly from Saturn under section 9.2(b) of the Sublease and Amended Sublease for "all costs, charges, and

expenses, including reasonable legal fees and disbursements incurred by Lessor [or BMH in its place] by reason of the occurrence of any Lessee Event of Default or the exercise of Lessor's remedies with respect thereto." Accordingly, we overrule Saturn's point of error.

### 5. Is BMH Entitled to Recover Attorney's Fees and Expenses?

Saturn argues the evidence is legally insufficient to support the trial court's findings of fact that BMH was entitled to recover $456,863.83 in attorney's fees and expenses pursuant to the terms of the Sublease and the Subordination Agreement.[17] The trial court's findings include, among other things:

> 52. Pursuant to the Sublease, and the Subordination Agreement, which gives BMH all of the rights, but none of the obligations of Evolution under the Sublease, Saturn is liable for all costs, charges and expenses, including reasonable legal fees and disbursements, incurred by the BMH by reason of the occurrence of Saturn's default and BMH's exercise of its remedies in connection therewith.
>
> . . . .
>
> Supplemental Finding of Fact 2. Based on the Court's Findings of Fact & Conclusions of Law signed on November 11, 2022 (the "November 11 Findings of Fact & Conclusions of Law"), BMH is entitled to recover attorneys' fees it incurred prosecuting its breach of contract claims against Saturn.
>
> . . . .
>
> Supplemental Finding of Fact 22. To the extent the award of attorneys' fees to BMH . . . is based on the Sublease[18] (Exhibit P-3) and the Subordination Agreement (Exhibit P-1), which gives BMH the right to all remedies available to the Lessor under the Sublease, the Sublease provides "Lessee is liable for all costs, charges and expenses, including reasonable legal fees and disbursements, incurred by the Lessor by reason of the occurrence of any Lessee Event of Default or the exercise of Lessor's remedies with respect thereto."

---

[17] Saturn also argues BMH was not entitled to attorney's fees and expenses, based on contentions already addressed and rejected above. *See supra* Section A. As a result, we need not address further here. *See* TEX. R. APP. P. 47.1. Saturn does not otherwise challenge the sufficiency of the evidence supporting the attorney's fee award.

[18] *See* Discussion *supra* regarding Sublease and Amended Sublease in Section A.3. (concluding references in findings to Sublease rather than Amended Sublease did not cause rendition of improper judgment and concluding evidence showed parties intended references to Sublease in Subordination Agreement to apply to any amendment of Sublease—or Amended Sublease).

To summarize, the trial court awarded BMH attorney's fees, costs of court, and other expenses in the total amount of $456,863.83, including $428,000 in attorneys' fees pursuant to the provision in the Sublease/Amended Sublease providing for "reasonable legal fees and disbursements." The remaining $28,863.83 is divided between "[o]ther taxable costs and legal expenses"—$28,188.93—which consist of court reporter and mediation costs, "[c]ourt [c]osts," and "[c]osts incurred in executi[ng] the Writ of Sequestration."

Turning to the trial court's award of attorney's fees, costs of court, and other expenses pursuant to the breach of contract claim, the trial court repeatedly invoked the Subordination Agreement and, more specifically, the following language taken from section 9.2(b) in the Sublease and Amended Sublease: "Lessee [Saturn] is liable for all costs, charges and expenses, including reasonable legal fees and disbursements."[19]

As noted above, BMH could pursue any remedy available to it against Evolution *or* Saturn under either agreement. Thus, it is clear the parties intended to allow BMH the option of enforcing the Sublease/Amended Sublease against Saturn directly. Does this mean Saturn could still be liable for "reasonable legal fees and disbursements"? Yes. Section 9.2(b) identifies "costs, charges and

---

[19] The parties do not dispute "reasonable legal fees" mean "reasonable attorney's fees." The Sublease/Amended Sublease include no other references to "attorney's fees." "Legal fees" are defined as "attorney's fees." *See, e.g.*, *Legal fees*, COLLINS, https://www.collinsdictionary.com/us/dictionary/english/legal-fees (defining "legal fees" as "fees paid to lawyers"). And the Texas Supreme Court has referred to "attorney's fees" as "legal fees." *See, e.g.*, *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 497 (Tex. 2019) (providing because claimant had not segregated legal fees accrued among one recoverable and two non-recoverable claims, court of appeals remanded case to trial court for new trial on attorney's fees); *Kinsel v. Lindsey*, 526 S.W.3d 411, 427 (Tex. 2017) ("The court of appeals further correctly recognized that a claimant must segregate legal fees accrued for those claims for which attorneys fees are recoverable from those that are not."); *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 313 (Tex. 2006) (explaining unrecoverable attorney's fees not rendered recoverable merely because they are nominal; there is no such exception in any contract, statute, or "the American Rule," and to the extent caselaw suggests common set of underlying facts necessarily made all claims arising therefrom "inseparable" and all legal fees recoverable, it went too far). Because the sentence identifies "reasonable legal fees and disbursements" as a type of "costs, charges and expenses," it is reasonable to apply the ordinary definition to disbursement. *See Disbursement*, BLACK'S LAW DICTIONARY (defining disbursement as "act of paying out money" or "[t]he money so paid; an amount of money given for a particular purpose"). Because it is accompanied by "reasonable legal fees," we can assume the intent of including it meant the payment of "disbursements" or "costs" in the context of litigation.

expenses" as "*including* reasonable legal fees and disbursements" (emphasis added).[20] In other words, reasonable legal fees and disbursements are a partial list of costs, charges and expenses. If reasonable legal fees and disbursements are a partial list of costs, charges, and expenses, then they are subject to the parties' intent with respect to section 9.2(b). Under that provision, Saturn would be chargeable for such costs, charges, and expenses.

Accordingly, BMH was entitled to recover attorney's fees, costs of court, and other expenses pursuant to the breach of contract claim by stepping into Evolution's shoes and enforcing Section 9.2(b), and the trial court's findings that it was entitled to attorney's fees, costs of court, and other expenses pursuant to the breach of contract claim is legally sufficient. Accordingly, we overrule Saturn's point of error.

### B. Whether Saturn Was Entitled to Damages from BMH and/or Evolution

Saturn argues the evidence is legally insufficient to support the trial court's findings of fact that it was not entitled to damages from BMH and/or Evolution for its counterclaims for costs and expenses. Specifically, it argues, (1) BMH and Evolution failed to provide any evidence challenging the amounts Saturn claims it was owed and (2) Saturn provided competent evidence supporting its damages of $694,067.50 for costs and expenses. Saturn challenges the following findings:

> 43. Saturn failed to comply with its agreement not to assert against BMH any defense, counterclaim or offset that Saturn may have against Evolution by asserting claims and defenses against BMH in this lawsuit based on alleged conduct of Evolution.
>
>  . . . .
>
> 55. Pursuant to the Subordination Agreement, Saturn waived its rights to assert any counterclaims against BMH it may have against Evolution under the Sublease.
>
>  . . . .

---

[20] "Include" is defined as "[t]o contain as a part of something" and the definition further provides "[t]he participle *including* typically indicates a partial list." *Include*, BLACK'S LAW DICTIONARY (12th ed. 2024) *available at* Westlaw.

60. Saturn failed to prove its counterclaims by the greater weight of credible evidence presented in this case.

Based on these findings, the trial court denied Saturn's counterclaims against BMH and Evolution.

### 1. Is Saturn Entitled to Recover on its Counterclaims from BMH?

We begin with findings 43 and 55, which include the legal conclusion that Saturn waived its rights to assert any counterclaims against BMH that it would otherwise have against MFA/Evolution under the Sublease. We "may review the trial court's legal conclusions drawn from the facts to determine their correctness." *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002) (citation omitted).

Section 7.7 of the Subordination Agreement provides Saturn "will not assert against Lessor [BMH] any defense, counter claim or offset that [it] may have against Lessee [MFA/Evolution]." Saturn explains it filed counterclaims against BMH and Evolution for $694,067.50 for costs and expenses for (1) fuel charges ($59,681.48), (2) third-party maintenance fees ($180,789.93), (3) hangar fees ($12,000), (4) pilot salaries ($186,837.78), (5) operating fees ($198,622.35), (6) charter expenses ($5,903.38), (7) subscription expenses ($24,548.22), and (8) internal labor, shop supplies, and consumables ($25,684.75). The parties do not dispute the meaning of section 7.7, and Saturn readily concedes it was obligated not to assert against BMH any counterclaims. Accordingly, we cannot conclude the trial court erred by concluding Saturn was not entitled to relief on its counterclaims against BMH.[21]

---

[21] For these same reasons, we cannot sustain Saturn's contention it would be entitled to relief from BMH under a theory of quantum meruit. *See* TEX. R. APP. P. 47.1; *see also Hill v. Shamoun & Norman, LLP*, 544 S.W.3d 724, 733 (Tex. 2018) ("A party generally cannot recover under a quantum-meruit claim when there is a valid contract covering the services or materials furnished.").

## 2. Is Saturn Entitled to Recover on its Counterclaims from Evolution?

However, section 7.7's bar to Saturn's counterclaims against BMH, by its plain language, does not apply to Evolution. As the party asserting the counterclaims against Evolution, Saturn had the burden to prove its counterclaims for costs and expenses. Because Saturn attacks the legal sufficiency of the adverse finding, it must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue. *See Dow Chem. Co.*, 46 S.W.3d at 241; *Nigerian Found.*, 2022 WL 2923202, at *5. We must therefore first examine the record for evidence that supports the finding, while ignoring all evidence to the contrary. *See Dow Chem.*, 46 S.W.3d at 241; *see, e.g.*, *Nigerian Found.*, 2022 WL 2923202, at *5.

Section 9.3 of the Sublease/Amended Sublease provides Evolution defaults on its obligations by, among other things, (1) "fail[ing] to perform or observe any other material covenant, condition or agreement required by Lessor under this Agreement," and (2) "fail[ing] to make any payment under this Agreement within ten (10) days after the same is due."[22] Saturn's remedies, in the event of default are identified in section 9.4, which provides: (1) Saturn may "declare this Agreement to be in default and, in addition to all remedies provided at law or in equity"; or (2) secure from Evolution "all costs, charges and expenses, including reasonable legal

---

[22] Section 3.5 of the Sublease/Amended Sublease provide Evolution is "responsible for paying or reimbursing" Saturn "for the costs and expenses set forth in Exhibit A" to the Sublease/Amended Sublease. These include fuel, maintenance fees, home hangar fees, transient hangar fees, pilot per diem, operating fees, charter marketing fees, lessee maintenance labor, and aircraft consumables. Evolution was required to "*directly* pay the applicable provider (instead of reimbursing [Saturn])" for the following such expenses: (1) fuel, oil, lubricants, and other additives purchased away from the Operating Base; (2) third-party hangars, (3) aircraft communication services, and (4) any other amounts reasonably required to ensure the operation, safety or efficiency of a flight. Evolution was required to pay Saturn directly for (1) fuel, oil, lubricants, and other additives purchased at the aircraft's home operating base and (2) all other reasonable flight expenses that Lessee incurs during the operation of Lessor Referred Charter flights. Saturn was required to reimburse Evolution for: (1) customs, foreign permit, and similar fees directly related to the flight, (2) customer requested catering, (3) passenger ground transportation, (4) flight planning and weather contract services, and (5) any other amounts reasonably required to ensure the operation, safety or efficiency of a flight. Section 4.4.2 provides Evolution was required to pay Saturn's "actual cost of employing a minimum of two pilots, and one mechanic (the "Dedicated Crew") necessary to operate and maintain the Aircraft."

fees and disbursements, incurred by the Lessee by reason of the occurrence of any Lessor Event of Default or the exercise of Lessee's remedies with respect thereto." The parties do not identify any provisions contradicting the foregoing, and we are aware of none.

The evidence in the record supporting the trial court's finding that "Saturn failed to prove its counterclaims by the greater weight of credible evidence presented in this case" includes, among other things:

- Failure to Conduct Maintenance and Mechanical Work or Conducting It Poorly
  - Brian Heath testified Jamie Thomas, Evolution's principal, saw in August 2017 that the crew struggled to restart the aircraft, and they popped off one of the panels on the tail cone and were surprised to discover a wiring harness that was duct-taped and zip-tied.
  - Heath testified a Saturn mechanic, Art Nelms—a whistleblower—informed BMH there was an arcing part that actually sparked inside of the cabin that had the potential to create a fire. Heath testified Saturn put this arcing part back in the aircraft after filing the contactors on it, without complying with FAA recertification rules. Nelms testified he told Evolution about the arcing contactor.
  - Nelms testified the auxiliary power unit was never inspected on the aircraft. He further testified flight control cables were also not inspected because Saturn lacked the equipment and the experience. Nelms testified this failure to conduct certain inspections was "standard practice."
  - Heath testified that based on the Embraer inspection, the aircraft was not airworthy when it left Saturn.
  - Heath testified Saturn's actions placed lives in danger.
- Use of Unqualified Employees or Employees with Substance Abuse Problems
  - Heath testified Saturn did not have anybody during the aircraft's inspection period that was Legacy certified, which was one of BMH's criteria. And this dearth of training included mechanics working on low utilization inspections of the aircraft. Nelms and Thomas testified to the same.
  - Heath testified Nelms informed BMH Saturn had a mechanic that was on an action plan for substance abuse that was found passed out on the floor of the maintenance shop, who had been given a final warning, who was reported to have alcohol on his breath at work, and who had signed off on sixty-plus efforts or maintenance actions on BMH's aircraft through May 2017. Nelms testified to the same and further testified he witnessed the mechanic using drugs at work.
- Artificially Altering Maintenance Records
  - Heath testified Saturn had a "corrupted culture from the top."

- o Heath testified based on testimony during depositions that he believed Saturn created maintenance records and billed BMH for work on the aircraft that never actually took place.

- o Nelms testified that aircraft inspections were often not completed but paperwork was forged to show them as complete by having mechanics fill in the paperwork for tasks that had not been completed. Nelms testified an example of this was to check the aircraft's fuel tanks for microbial growth, which was marked completed, but was not completed. Nelms testified Saturn had no non-expired test kits for microbial growth.

- o Nelms testified Saturn rented equipment from third parties for specific inspections that it would not utilize in order to demonstrate falsely that the specific inspection had been completed.

- o Thomas testified prior to writing up any aircraft maintenance discrepancies, a Saturn employee, Allen Dunn, asked he be told about them first before documenting them, which Thomas conceded was technically not wrong in the maintenance manuals.

- Inaccurate or Poor Billing

  - o Thomas testified he had trouble getting data and invoices related to the aircraft in a timely manner; he explained Evolution knew what expenses it was paying, but it did not know the expenses Saturn was accumulating.

  - o Heath testified Saturn had a series of invoices for the same type of repair or service done over a seven-month period where they charged six or seven different rates for the same service. There were also errors and duplicative entries in the stack of invoices admitted by Saturn after the fact.

  - o Tiffany Clark, Saturn's controller, testified Saturn marked up the fuel price approximately 40% above the lowest contract fuel price available to Saturn at Signature Flight Support KAUS in its fuel invoices, contrary to Exhibit A's requirement in the Amended Sublease.

  - o Heath testified Saturn's accounting was not generally accurate or reliable, and a claim by Saturn that it was not paid $198,000 in operating fees was not something to be taken at face value. Heath further testified an example of this was the charges for oil changes all being different amounts across seven invoices and getting more expensive as time went on.

  - o Heath testified Saturn never secured Evolution's permission in writing in advance for maintenance events above the thresholds for which permission was required. For example, Thomas testified Saturn was also required to request in writing Evolution's permission for scheduled maintenance in excess of $10,000, but it never did so in writing.

  - o Thomas testified Saturn did not comply with the requirements in the Sublease that it provide monthly statements; only at the very beginning did Evolution receive monthly statements.

- o Heath testified Saturn did not provide BMH with regular financial reporting.
- Poor Aircraft Recordkeeping
  - o Heath testified Saturn's maintenance shop was a "black hole" for reporting and information.
  - o Thomas testified Saturn did not comply with Section 4.3.6 of the Amended Sublease requiring Saturn to maintain a legible form and maintain responsibility for all aircraft documents, including without limitation all records required to be kept under Part 135 at all times during the agreement terms including but not limited to crew rest and duty records, flight records, manifests, and maintenance records.
  - o Heath testified Saturn left gaps in the logbooks—required to be kept contemporaneously literally to the day when any kind of work is done—which were confirmed by Wing Aviation when they came in and did a review as well as after the fact.

Put simply, the trial court could have concluded, based on this evidence, Saturn's records and invoices were not credible and Saturn failed to demonstrate it was entitled to relief on its counterclaims against Evolution. Indulging every reasonable inference, the foregoing evidence constitutes some evidence supporting the trial court's finding Saturn failed to prove its counterclaims against Evolution. *See Dow Chem.*, 46 S.W.3d at 241; *see, e.g.*, *Nigerian Found.*, 2022 WL 2923202, at *5.

Accordingly, we overrule Saturn's claim that the evidence was legally insufficient to support the trial court's findings that it failed to prove its counterclaims.[23] *See Dow Chem. Co.*, 46 S.W.3d at 241; *Nigerian Found.*, 2022 WL 2923202, at *5.[24]

---

[23] Saturn contends the trial court erred when it permitted BMH to withdraw its sequestration bond prior to resolution of this appeal because it conclusively proved its counterclaims against BMH. Because we conclude the evidence supporting the trial court's findings as to Saturn's counterclaims is legally sufficient, we need not consider Saturn's contention. *See* TEX. R. APP. P. 47.1.

[24] Saturn also contends the trial court erred when it voided its lien for the same reasons we rejected above. Because we rejected each of these arguments above and because we conclude Saturn has failed to demonstrate its entitlement to relief on its counterclaims, we need not consider Saturn's contention, and, in any event, any such error would be harmless. *See* TEX. R. APP. P. 44.1, 47.1. Even if we were to consider Saturn's contention, section 7.10 of the Subordination Agreement plainly provides BMH's security interest in the aircraft was to remain "free and clear of all liens and encumbrances."

## C. Whether Evolution Established its Right to Damages

Saturn argues the evidence is legally insufficient to support the trial court's findings of fact that Evolution established its right to breach of contract damages, consisting of a return of its $60,000 "operating deposit" under the Sublease/Amended Sublease. Saturn specifically challenges the following findings of fact:

> 50. The following sums of money, if paid now in cash, would fairly and reasonably compensate Evolution for its damages that resulted from Saturn's failure to comply with the Sublease.
>
> > a. Evolution is entitled to return of the $60,000.00 operating deposit paid to Saturn pursuant to and in accordance with the Sublease.
>
> . . . .
>
> 57. Evolution paid Saturn $547,920.65 between execution and termination of the Sublease.
>
> 58. Saturn failed to demonstrate whether or in what manner the operating deposit was applied, if at all.
>
> 59. Saturn failed to demonstrate whether or in what manner Evolution's payments were applied, if at all.

Based on the foregoing findings, the trial court granted Evolution judgment for actual damages in the form of the return of the $60,000 operating deposit paid to Saturn pursuant to the Sublease/Amended Sublease. Here, Saturn is challenging legal sufficiency on a matter for which it does not have the burden of proof, and we apply our appropriate standard of review, as detailed above, under those circumstances. *See, e.g.*, *Graham Cent. Station, Inc. v. Pena*, 442 S.W.3d 261, 263 (Tex. 2014); *City of Keller*, 168 S.W.3d at 810.

Turning to the evidence, section 3.10 of the Sublease/Amended Sublease provides, in pertinent part:

> As soon as possible after the effective date of this Agreement Lessee shall invoice Lessor the full amount of the Deposit, . . . said Deposit to be used by Lessee to assist in the coordination of cash flow and/or as otherwise contemplated under this Agreement. . . . The Deposit may be used to pay for Lessor Referred Charter flights, associated repositioning flights, maintenance flights, maintenance repositioning flights, and training Aircraft expenses and operating costs incurred

by Lessee prior to receipt of Lessor's payment for such expenses, as provided herein. Upon Lessee's receipt of payment for such expenses, Lessee shall credit the payment or a portion of the payment, as applicable, to the Deposit. If the Deposit falls below $20,000.00, Lessee shall have no obligation to accept or operate the Aircraft on Lessor Referred Charters, associated repositioning flights, maintenance flights, maintenance repositioning flights, or training flights until the Deposit is replenished. Upon termination of this agreement Lessee shall refund the full amount of the deposit less any fees and expenses owed to Lessee by Lessor within fifteen (15) days from the date of termination.

Succinctly, MFA was required to provide a deposit of $60,000, Saturn could use it to assist in the coordination of cash flow and/or as otherwise contemplated under the agreement for certain enumerated items prior to receipt of payment from MFA/Evolution. Saturn was required to credit MFA/Evolution's payments back to any deductions on the deposit. Saturn could cease accepting or operating the aircraft for certain flights if the deposit fell below $20,000. And "[u]pon termination of this agreement Lessee [Saturn] shall refund the full amount of the deposit less any fees and expenses owed to Lessee [Saturn] by Lessor [Evolution] within fifteen (15) days from the date of termination." In other words, Evolution had the burden to show: (1) there was a deposit, (2) it terminated the agreement, and (3) Saturn failed to return the deposit after termination at whatever amount it was calculated at based on Saturn's usage of it to assist in the coordination of cash flow and/or for certain enumerated items prior to receipt of payment from Evolution.

Tiffany Clark, Saturn's controller, testified the deposit was paid to Saturn. There is no dispute the agreements were terminated. Clark also testified Saturn retained the $60,000 deposit under the Sublease, explaining the deposit "lowered the balance" owed by BMH and Evolution as a "credit on their account" reflected in "her books."[25] Jamie Thomas testified Evolution made payments to Saturn of approximately $547,000. Based on Evolution's payments, when combined with the legally sufficient evidence supporting the trial court's rejection of Saturn's counterclaims,

---

[25] She further testified such a credit was done "prior to" her appointment as controller.

we cannot conclude no evidence supports the trial court's adverse finding Evolution established

its right to a return of its $60,000 operating deposit under the Sublease/Amended Sublease. *See*

*Graham Cent. Station, Inc.*, 442 S.W.3d at 263. Accordingly, Saturn's point of error is overruled.[26]

### D. Damages for Replacement Aircraft

Saturn also argues the evidence is legally insufficient to support the trial court's finding

that Saturn is liable for damages in the amount of $197,400 for the reasonable and necessary cost

of replacement aircraft while BMH was securing possession of the aircraft at issue, having it

repaired, inspected, returned to airworthy condition, and returned to charter service. Saturn

specifically argues (1) none of the agreements provide for replacement aircraft damages, and

(2) there was no evidence otherwise supporting the cost to acquire such replacement aircraft.

The trial court found, among other things:

54. The following sums . . . would fairly and reasonably compensate BMH for its damages proximately caused by Saturn's fraud[27]:

. . . .

b. BMH incurred $197,400.00 in reasonable and necessary cost of replacement aircraft while BMH was securing possession of the Aircraft; having it repaired, inspected, returned to airworthy condition and returned to charter service which were caused by Saturn's failure to comply with the Subordination Agreement and Sublease.[28]

. . . .

---

[26] During oral argument, counsel for BMH and Evolution "concede[d] that 18 thousand and change [i.e., the trial court's additional damages award to Evolution of $18,595.66] should be remitted; we're only defending the sixty [i.e., the $60,000]." We therefore reverse the trial court's judgment of $18,595.66 in damages to Evolution for "reasonable and necessary incidental and consequential costs to assist BMH in retaking possession of the Aircraft, having the Aircraft inspected and repaired and returning the Aircraft to service caused by Saturn's failure to comply," and render judgment thereon for Saturn.

[27] The trial court issued Supplemental Finding of Fact 27 to clarify that when it explained such damages were "caused by Saturn's fraud," it intended its finding to state such damages "were caused by Saturn's failure to comply with the Subordination Agreement and Sublease."

[28] *See* Discussion *supra* regarding Sublease and Amended Sublease in Section A.3. (concluding references in findings to Sublease rather than Amended Sublease did not cause rendition of improper judgment and concluding evidence showed parties intended references to Sublease in Subordination Agreement to apply to any amendment of Sublease— or Amended Sublease).

61. Evolution and BMH's claims are not barred, in whole or in part, by the terms of the Lease, Sublease, Subordination agreement, BMH-MFA Assignment, MFA-Saturn Assignment, or the Amended Sublease.

The trial court's findings identify Saturn's liability as arising under the Subordination Agreement and the Sublease/Amended Sublease.[29] In this opinion, we have held the parties agreed, in section 7.1 of the Subordination Agreement, to allow BMH to enforce the Sublease/Amended Sublease in the event of default and that, under Section 7.6, BMH would have all of the rights that MFA/Evolution had under that agreement. But that also means BMH is limited by the rights set forth in the Sublease/Amended Sublease.

> Section 11 of the Sublease/Amended Sublease provides, in pertinent part:

> Notwithstanding any other provisions in this agreement, it is expressly agreed and understood that *under no circumstances shall either Party be liable to the other for any indirect, consequential, special, punitive or exemplary damages, whether in contract or tort* (including strict liability and negligence), *such as but not limited to*: . . . *costs associated with substitution or replacement aircraft*, suffered by the other party, or their owners, officers or members hereunder, *or any third party*.[30]

The parties do not dispute that this language plainly means what it says: no damages for costs associated with substitution or replacement aircraft. *See Cost*, BLACK'S LAW DICTIONARY (providing definition of cost as that identified in discussion of section 7.1 above and also including "replacement cost" which is "[t]he cost of a substitute asset that is equivalent to an asset currently held"); *Associated*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/associated (providing associated as "related, connected, or combined together"); *Replacement*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/replacement (providing replacement is "the action or process

---

[29] *See* Discussion *supra* regarding Sublease and Amended Sublease in Section A.3. (concluding references in findings to Sublease rather than Amended Sublease did not cause rendition of improper judgment and concluding evidence showed parties intended references to Sublease in Subordination Agreement to apply to any amendment of sublease—or Amended Sublease).

[30] The Lease contains a nearly identical provision in Section 12.

of replacing."). Nor do they dispute that the provision further bars recovery for replacement aircraft damages by third parties, like BMH, for example.[31] And Dennis Allen Blackburn, Saturn's expert and the owner of an aviation services business testified standard language in aircraft dry leases include disclaimers for loss of use. This evidence establishes conclusively the opposite of a vital fact making the evidence supporting the foregoing findings providing for replacement aircraft costs legally insufficient. *See Graham Cent. Station, Inc.*, 442 S.W.3d at 263; *City of Keller*, 168 S.W.3d at 810.

Accordingly, BMH was not entitled to replacement aircraft damages, the evidence supporting this finding is legally insufficient, and we must sustain Saturn's point of error. *See Dow Chem.*, 46 S.W.3d at 241; *Nigerian Found.*, 2022 WL 2923202, at *5.

### BMH AND EVOLUTION'S CROSS-APPEAL: WHETHER BMH AND EVOLUTION PROPERLY ESTABLISHED THEIR LOST PROFIT OR "LOSS OF USE" DAMAGES

BMH and Evolution argue they proved lost profit or "loss of use" damages as a matter of law. If, as here, a trial court does not issue findings of fact and conclusions of law, as to a certain issue, "we imply all relevant facts necessary to support the judgment that are supported by evidence." *State v. Volkswagen Aktiengesellschaft*, 669 S.W.3d 399, 413 (Tex. 2023) (quoting *Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 150 (Tex. 2013)) (internal quotation marks omitted). However, "[w]hen the appellate record includes the reporter's and clerk's records, these implied findings are not conclusive and may be challenged for legal and factual sufficiency in the appropriate appellate court."[32] *BMC Software*, 83 S.W.3d at 795; *see also Est. of Stavron*,

---

[31] Nor do they dispute that such costs are distinguishable from Sublease/Amended Sublease Section 9.2(b) costs for an event of default. *See Wal-Mart Stores, Inc. v. Xerox State & Loc. Sols., Inc.*, 663 S.W.3d 569, 587 (Tex. 2023) (providing specific contract provision controls over general one).

[32] BMH and Evolution's contentions with respect to what they are challenging as to lost profit damages are not "clear and concise," as required by the Texas Rules of Appellate Procedure. *See* TEX. R. APP. P. 38.1(i). On the one hand, they argue they are entitled to lost profit damages as a "matter of law," but they do not provide what is our appropriate

No. 02-20-00404-CV, 2021 WL 5227081, at *4 (Tex. App.—Fort Worth Nov. 10, 2021, no pet.) (mem. op.) ("We apply the same standard when reviewing the sufficiency of the evidence to support implied findings that we use to review the evidentiary sufficiency of jury findings or a trial court's express findings of fact."). "If the parties present conflicting evidence that raises a fact issue, we will resolve the dispute by upholding the trial court's determination." *Volkswagen Aktiengesellschaft*, 669 S.W.3d at 413 (quoting *TV Azteca, S.A.B. de C.V. v. Ruiz*, 490 S.W.3d 29, 36 n.4 (Tex. 2016)) (internal quotation marks omitted). Accordingly, the trial court impliedly found BMH and Evolution were not entitled to lost profit or "loss of use" damages and rendered judgment that they take nothing on those claims.

Turning to the evidence, section 11 of the Amended Sublease provides: "under no circumstances shall either Party be liable to the other for any indirect, consequential, special, punitive or exemplary damages, . . . in contract . . . , such as but not limited to: loss of use or anticipated profits . . . suffered by the other party, . . . or any third party." As we discussed above, just as Section 11 applies to limit BMH's recovery of replacement aircraft damages, so does it apply to BMH and Evolution's plea for lost profit damages. Accordingly, we overruled BMH and Evolution's sole cross-point of error. *See Graham Cent. Station, Inc.*, 442 S.W.3d at 263; *City of Keller*, 168 S.W.3d at 810.

---

standard of review. Given the size of this appeal, this is not "clear and concise argument" with "appropriate citations to authorities." *See* TEX. R. APP. P. 38.1(i); *cf. H.E.B., L.L.C. v. Ardinger*, 369 S.W.3d 496, 520 (Tex. App.—Fort Worth 2012, no pet.); *Golden v. Milstead Towing & Storage*, No. 09-21-00043-CV, 2022 WL 1412303, at *3 (Tex. App.—Beaumont May 5, 2022, no pet.) (mem. op.). However, because we endeavor to address the merits as we are required to do by the Texas Supreme Court, we construe BMH and Evolution's arguments as raising a legal sufficiency challenge to the trial court's implied findings that they were not entitled to lost profit damages. *See, e.g.*, *Mitschke v. Borromeo*, 645 S.W.3d 251, 260, 261–62 (Tex. 2022).

**"NO, THIS IS NOT THE END OF THE WORLD. BUT YOU CAN SEE IT FROM HERE."**[33]

Based on the reasoning set forth above, we:

1. affirm the portion of the trial court's December 25, 2022 final judgment awarding appellee BMH AIR, LLC $498,109.28 in actual damages consisting of: (1) $262,937.40 in reasonable and necessary costs to inspect and repair the Aircraft and return it to airworthy condition; (2) $37,771.88 in reasonable and necessary costs in retaking possession of the Aircraft, having the Aircraft inspected and repaired, and returning the Aircraft to service; and (3) any prejudgment and post-judgment interest on such sum;

2. reverse the portion of the trial court's December 25, 2022 final judgment awarding BMH $197,400.00 in reasonable and necessary costs of replacement aircraft;

3. affirm the portion of the trial court's December 25, 2022 final judgment awarding BMH $456,863.83, consisting of (1) $428,000.00 in reasonable legal fees and disbursements, (2) $28,863.83 in costs, charges, and expenses; and (3) any post-judgment interest on such sum;

4. affirm the portion of the trial court's December 25, 2022 final judgment awarding appellee Evolution Jets, LLC $60,000.00 in actual damages for the return of its operating deposit paid to Saturn;

5. reverse the portion of the trial court's December 25, 2022 final judgment awarding Evolution $18,595.66 for reasonable and necessary incidental and consequential costs to assist BMH in retaking possession of the Aircraft, having the Aircraft inspected and

---

[33] ARMAGEDDON (Touchstone Pictures 1998) (Willis's character Harry Stamper referring to asteroid hitting Earth as not end of the world, but its impending destruction).

repaired and returning the Aircraft to service, as well as any prejudgment and post-judgment interest on such sum; and

6. remand to the trial court for entry of a judgment that comports with the decision of this court, as well as any prejudgment and post-judgment interest on such sum, and costs allowable by law, to be determined and calculated by the trial court. *See* TEX. R. APP. P. 43.3(a).

7. The trial court's judgment, including the February 17, 2023 order modifying final judgment in part and the February 27, 2023 amended order modifying final judgment in part, is otherwise affirmed. The parts of the trial court's judgment not reversed herein are not affected by this court's judgment and remain in full effect.

Lori Massey Brissette, Justice